## SAMUEL BERTHOLF, Respondent, *v.* JAMES O'REILLY, Impleaded, etc., Appellant.

The Legislature has power to create a cause of action for damages in favor of a person injured in person or property by the act of an intoxicated person against the owner of real property, whose only connection with the injury is that he leased the premises where the liquor causing the intoxication was sold or given away, with knowledge that intoxicating liquors were to be sold thereon.

The liability may be imposed irrespective of the question whether the sale or giving away of the liquor was lawful or unlawful, or of any question of negligence on the part of the landlord or tenant.

Such a legislative enactment is not violative of the constitutional provision prohibiting the taking of private property without "due process of law" (State Const., art. 1, § 6); while it may indirectly operate to restrain the absolute freedom of the owner in the use of his property and so impair its value, this is not a taking within the meaning of the Constitution.

All property is held subject to the general police power of the State to regulate or control its use to secure the general safety and the public welfare.

The Legislature, having control of the subject of the traffic in, and use of intoxicating liquors, may make such regulations to prevent the public evils and private injuries resulting from intoxication as, in its judgment, are calculated to accomplish this end.

The question whether a statute is a valid exercise of legislative power is to be determined solely by reference to constitutional restraints and prohibitions; it may not be declared void because deemed to be opposed to natural justice and equity.

Accordingly, *held,* that the act of 1873, known as "The Civil Damage Act" (chap. 646, Laws of 1873), was constitutional and valid.

(Argued December 5, 1877; decided November 12, 1878.)

APPEAL from judgment of the General Term of the Supreme Court, in the second judicial department, affirming a judgment in favor of plaintiff, entered upon a verdict. (Reported below, 8 Hun, 16.)

The nature of the action and the facts are set forth sufficiently in the opinion.

*Lewis E. Carr,* for appellant. The civil damage act so far as it assumes to give a right of action against the owner

of the building in which the intoxicating liquors were sold for damages is unconstitutional. (*Powers* v. *Bergen*, 6 N. Y., 358, 367; *Wilkinson* v. *Leland*, 2 Peters, 657; *Taylor* v. *Porter*, 4 Hill, 140; *In the Matter Albany St.*, 11 Wend., 149; *Bloodgood* v. *Mohawk and Hudson R. R. Co.*, 18 id., 59.) It invades the legal protection guaranteed to every property owner, that his property shall not be taken against his will for private use. (1 Blackstone, 138; 1 Bouvier's Institutes, 181, 182, 183; *Wynehamer* v. *People*, 13 N. Y., 387; Opinion COMSTOCK, J., 396, 397, 398; *Williams* v. *N. Y. C. R. R. Co.*, 16 N. Y., 97; *Glover* v. *Powett*, 10 N. J. Eq. [Stock.], 211; *Morgan* v. *King*, 35 N. Y., 454; *Palairet's Appeal*, 5 American R., 450; *Eaton* v. *Concord, etc., R. R. Co.*, 12 id., 147.) It was unconstitutional because it deprived the owner of the building wherein intoxicating liquors may be sold of the freedom from liability for the tenant's acts which belongs to other landlords. (*Taylor* v. *Porter*, 4 Hill, 140, 145, 146; *Wynehamer* v. *People*, 13 N. Y., 387; Opinion COMSTOCK, J., 392, 393, 394, 395; *Westervelt* v. *Gregg*, 12 N. Y., 209, 322; Potter's Dwar. on Statutes, 430; *Burch* v. *Newburg*, 10 N. Y., 374, opinion JEWETT, J.; *Marburg* v. *Madisen*, 1 Cranch, 137; *Parsons* v. *Russell*, 11 Mich., 113; *Baker* v. *Pope*, 2 Hun, 556; *Hayes* v. *Phelan*, 4 id., 733; *Jackson* v. *Brookins*, 5 id., 530; Laws of 1873, chap. 583, p. 895; *People* v. *Parker*, 15 How., 551; *People* v. *Erwin*, 4 Denio, 129.) The owner of property that may be damaged either by willful or negligent acts of another can look for redress only to the proximate cause, that is, the one doing the injury. (*Ryan* v. *N. Y. Cent. R. R. Co.*, 35 N. Y., 210; *McCaffery* v. *D. and P. M. R. R. Co.*, 61 id., 178; *City Buffalo* v. *Halloway*, 7 id., 493; *Webb* v. *R., W. and O. R. R. Co.*, 49 id., 420; *Hayes* v. *Phelan*, 4 Hun, 732.)

*W. J. Groo*, for respondent. The Legislature had authority to pass the civil damage act and it did not contravene the provisions of article 1, sections 1 and 6 of the Constitution. (5 How., 504–577; *Met. Bd. of Excise* v. *Barril*, 34

N. Y., 657–666; 4 Den., 129; 15 How., 551; 54 Barb., 299; *Phelps* v. *Racey*, 60 N. Y., 11–14; *Baker* v. *Pope*, 2 Hun, 556; *Phelan* v. *Hayes*, 4 id., 733; *Dubois* v. *Miller*, 5 id., 332; *Jackson* v. *Brookins*, id., 530.) Similar laws have been sustained in other States. (*State* v. *Ludington*, 33 Wisc., 107; *Wightumn* v. *Devere*, id., 570; *Beclare* v. *Newton*, 54 N. H., 117; *Stanton* v. *Simpson*, 48 Vt., 628; *Kreiton* v. *Nichols*, 28 Mich., 496; *Schneider* v. *Hosier*, 21 Ohio St., 98; *Mulford* v. *Clewell*, id., 191; *Boyd* v. *Matt*, 27 id., 259; *Worley* v. *Springson*, 38 Iowa, 465; *Woolbeater* v. *Risley*, id., 486; *Hackett* v. *Smelsley*, 77 Ill., 109.)

ANDREWS, J. This and other cases which have been argued and are awaiting the decision of the court present the question of the constitutionality of the "act to suppress intemperance, pauperism and crime," passed April 29, 1873, commonly known as the civil damage act. Some of the cases are actions against the vendors of liquors sold to be drank by the purchasers, and causing intoxication and consequential injury to the plaintiffs. This action is brought by the plaintiff against the defendant, as the landlord of hotel premises, let with knowledge that intoxicating liquors were to be sold therein by the lessee, to recover the value of a horse owned by the plaintiff, which died in consequence of having been overdriven by the plaintiff's son while in a state of intoxication, produced in part by liquor sold him by the lessee at his bar on the leased premises. The essential facts, as established by the verdict of the jury, may be briefly stated.

The defendant when the act in question was passed was the owner of a hotel building and premises. In June, 1875, he leased them to one Firnhaber knowing that the lessee intended to occupy the building for a hotel and boarding-house, and sell intoxicating liquors therein. The lessee entered into possession and opened a bar in the hotel, and with the defendant's knowledge commenced selling liquors therefrom. On Sunday, July 18, 1875, the plaintiff's son,

who was residing with his father, informed him that he had some business with a person residing about four miles from the father's residence, and thereupon, with the plaintiff's knowledge, took his horse and buggy and drove away.

He did not go to the place where he informed the plaintiff he intended to go, but went to the village, where Firnhaber's hotel was located, and to the hotel, and there purchased and drank whiskey several times at the bar, and then drove to a neighboring village and drank again, and returned to Firnhaber's, drinking again on his return. He became, in consequence of these repeated potations, intoxicated, was arrested for disorderly conduct in the streets, and after being detained in custody for a time was discharged, and in the evening started for home, and the horse soon after it reached the plaintiff's house died. The jury have found, and the evidence fully justifies the finding, that it died from overdriving by the plaintiff's son, and that his treatment of the horse was caused by his intoxication.

Firnhaber had no license to sell intoxicating liquors. It was understood between him and the defendant, when the lease was made, that a license was to be procured, and the defendant informed him that he would see that he had one. The plaintiff's son was of intemperate habits, and at one time had been an inmate of an inebriate asylum. The plaintiff recovered a verdict for the value of the horse.

It cannot be disputed that the facts found bring the case within the terms of the statute and authorize the recovery, if the law itself is valid. The act gives to every husband, wife, parent, guardian, employer or other person, "who shall be injured in person or property or means of support by any intoxicated person or in consequence of the intoxication" of any person, a right of action against any person who shall by selling or giving away intoxicating liquors have caused the intoxication, in whole or in part, and declares that "any person or persons, owning or renting or permitting the occupation of any building or premises, and having knowledge that intoxicating liquors are to be sold thereon, shall be liable,

severally and jointly with the person or persons selling or giving intoxicating liquors aforesaid, for all damages sustained and for exemplary damages." All the elements of the landlord's liability under the act exist in this case, viz. : the leasing of premises with knowledge that intoxicating liquors were to be sold thereon ; the sale by the tenant, producing intoxication ; and the act of the intoxicated person, causing injury to the property of the plaintiff.

The question we are now to determine is whether the Legislature has the power to create a cause of action for damages, in favor of a person injured in person or property by the act of an intoxicated person, against the owner of real property, whose only connection with the injury is that he leased the premises where the liquor causing the intoxication was sold or given away, with knowledge that intoxicating liquors were to be sold thereon.

To realize the full force of this inquiry it is to be observed that the leasing of premises to be used as a place for the sale of liquors is a lawful act, not prohibited by this or any other statute. The liability of the landlord is not made to depend upon the nature of the act of the tenant, but exists irrespective of the fact whether the sale or giving away of the liquor was lawful or unlawful, that is, whether it was authorized by the license law of the State, or was made in violation of that law. Nor does the liability depend upon any question of negligence of the landlord in the selection of the tenant, or of the tenant in selling the liquor. Although the person to whom liquor is sold is at the time apparently a man of sober habits and, so far as the vendor knows, one whose appetite for strong drink is habitually controlled by his reason and judgment, yet if it turns out that the liquor sold causes or contributes to the intoxication of the person to whom the sale or gift is made, under the influence of which he commits an injury to person or property, the seller and his landlord are by the act made jointly and severally responsible. The element of care or diligence on the part of the seller or landlord does not enter into the question of liability.

The statute imposes upon the dealer and the landlord the risk of any injury which may be caused by the traffic. It cannot be denied that the liability sought to be imposed by the act is of a very sweeping character and may, in many cases, entail severe pecuniary liability, and its language may include cases not within the real purpose of the enactment. The owner of a building who lets it to be occupied for the sale of general merchandize, including wines and liquors, may, under the act, be made liable for the acts of an intoxicated person, where his only fault is that he leased the premises for a general business, including the sale of intoxicating liquors, in the same way as other merchandize. The liability is not restricted to the results of intoxication from liquors sold or given away to be drank on the premises of the seller. There is no way by which the owner of real property can escape possible liability for the results of intoxication where he leases or permits the occupation of his premises, with the knowledge that the business of the sale of liquors is to be carried on on the premises, whether alone or in connection with other merchandize, or whether they are to be sold to be drank on the premises or to be carried away and used elsewhere. His only absolute protection against the liability imposed by the act is to be found in not using or permitting the premises to be used for the sale of intoxicating liquors.

The question whether the act under consideration is a valid exercise of legislative power is to be determined solely by reference to constitutional restraints and prohibitions. The legislative power has no other limitation. If an act can stand when brought to the test of the Constitution the question of its validity is at an end, and neither the executive or judicial department of the government can refuse to recognize or enforce it. The theory that laws may be declared void when deemed to be opposed to natural justice and equity, although they do not violate any constitutional provision, has some support in the *dicta* of learned judges, but has not been approved, so far as we know, by any authoritative adjudication, and is repudiated by numerous authori-

ties. Indeed, under the broad and liberal interpretation now given to constitutional guaranties, there can be no violation of fundamental rights by legislation which will not fall within the express or implied prohibition and restraints of the Constitution, and it is unnecessary to seek for principles outside of the Constitution, under which such legislation may be condemned.

The main guaranty of private rights against unjust legislation is found in that memorable clause in the bill of rights, that no person shall " be deprived of life, liberty or property without due process of law ; " (Const., art. 1, sec. 6.) This guaranty is not construed in any narrow or technical sense. The right to life may be invaded, without its destruction. One may be deprived of his liberty in a constitutional sense without putting his person in confinement. Property may be taken without manual interference therewith or its physical destruction. The right to life includes the right of the individual to his body in its completeness and without dismemberment ; the right to liberty, the right to exercise his faculties and to follow a lawful avocation for the support of life ; the right of property, the right to acquire power and enjoy it in any way consistent with the equal rights of others and the just exactions and demands of the State.

The comprehensive scope of the guaranty of private property finds many illustrations in judicial decisions in our State. The limit placed upon the power of taxation is an instance. The right of taxation is an attribute of sovereignty, without which governments would be powerless, and organized society could not exist, and it is said to be unlimited. But this is only true when it is exercised for a public purpose. The taking of private property for a private purpose, under the guise of taxation, is no less a violation of the Constitution than if the property of A. was attempted to be transferred to B. by the mere force of a legislative mandate. It is upon this principle that we have recently held, in the case of *Weismer* v. *The Village of Douglass* (64 N. Y., 92), that a law involving taxation in aid of a

private enterprise and business was unconstitutional and void. In *Wynehamer* v. *The People* (13 N. Y., 378), the sanctity of private property, and the efficiency of constitutional guaranties for its protection, under whatever guise it is attempted to be assailed by legislation, was most ably and amply vindicated. The provisions in the act then under consideration were held to deprive persons owning intoxicating liquors, at the time of its passage, of their property, although their title might not be affected by the act, or the property itself, in its material substance, taken or destroyed. "There may" says MILLER, J., in *Pumpelly* v. *The Green Bay Co.* (13 Wall., 177), "be such serious interruption to the common and necessary use of property as will be equivalent to a taking, within the meaning of the Constitution;" and this observation is warranted by the general tenor of judicial auth ~ty.

Admitting, as we      the soundness of this view, and fully approving it, we          ack to the proposition that no law can be pronounceu       , for the reason simply that it violates our notions of ju..  .e, is oppressive and unfair in its operation, or because, in the opinion of some or all of the citizens of the State, it is not justified by public necessity, or designed to promote the public welfare. We repeat, if it violates no constitutional provision, it is valid and must be obeyed. The remedy for unjust or unwise legislation, not obnoxious to constitutional objections, is to be found in a change by the people of their representatives, according to the methods provided by the Constitution.

There are two general grounds upon which the act in question is claimed to be unconstitutional ; *first*, that it operates to restrain the lawful use of real property by the owner, inasmuch as it attaches to the particluar use a liability, which substantially amounts to a prohibition of such use, and, as to the seller, imposes a pecuniary responsibility, which interferes with the traffic in intoxicating liquors, although the business is authorized by law ; and *second*, that it creates a right of action unknown to the common

law, and subjects the property of one person to be taken, in satisfaction of injuries sustained by another remotely resulting from an act of the person charged, which act may be neither negligent or wrongful, but may be, in all respects, in conformity with law. The act, it is said, in effect authorizes the taking of private property without " due process of law," contrary to article 1, section 6, of the Constitution, and is also a violation of the first section of the same article, which declares that " no member of this State shall be disfranchized, or deprived of any of the rights or privileges secured to any of the citizens thereof, unless by the law of the land or the judgment of his peers." If the act is " due process of law," within the sixth section of the first article, it is manifest that it is valid within the other section to which reference is made.

The right of the State to regulate the traffic in intoxicating liquors, within its limits, has been exercised from the foundation of the government, and is not open to question. The State may prescribe the persons by whom and the conditions under which the traffic may be carried on. It may impose upon those who act under its license such liabilities and penalties as in its judgment are proper to secure society against the dangers of the traffic and individuals against injuries committed by intoxicated persons under the influence of or resulting from their intoxication.

The licensee, by accepting a license and acquiring thereby a privilege from the State to engage in the traffic, a privilege confined to those who are licensees and withheld from all other citizens, takes it subject to such conditions as the Legislature may attach to its exercise. He consents to be bound by the conditions when he accepts the license, and the State is the sole judge of the reasonableness of the conditions imposed. And the power of the Legislature, as a part of the excise system, to impose the liabilities, imposed by the act in question, upon licensed dealers, as a condition of granting the license, cannot, we think, be questioned. A party cannot object, upon constitutional grounds, to a

liability which he has voluntarily assumed, in consideration of a benefit conferred, and one may renounce even a constitutional provision made for his own benefit.

The extent to which the Legislature has heretofore gone, in imposing restrictions or liabilities upon licensees, may be seen by reference to the excise law of 1857 (chap. 628), many provisions of which are to be found in earlier legislation. Section 10 prohibits the sale of liquor on credit to any persons other than lodgers, and avoids all securities taken therefor. Section 19 gives a penalty of fifty dollars to a wife against a dealer in intoxicating liquors, who shall sell or give intoxicating liquor to a husband after complaint made and notice given, as provided by the section, and a like penalty is given, under similar circumstances, for selling or giving away intoxicating liquor to a wife or minor child. Section 28 contains the germ of the act now under consideration. It provides that any person who shall sell strong or spirituous liquors to any of the individuals to whom it is declared by the act unlawful to make such sale, "shall be liable for all damages which may be sustained, in consequence of such sale," to be recovered by the party sustaining the injury or by the overseers of the poor for his benefit.

The act of 1873 cannot, however, be sustained in all its aspects upon the theory that the liability imposed by the act is a condition of a privilege granted by the State. This cannot be affirmed in respect of the liability of the landlord, whose right to lease his property belongs to him, as an incident to ownership. The responsibility imposed is not confined to cases of unlawful sales of liquors or to sales made by licensed vendors. Any person selling or giving away liquor, which causes intoxication and consequent injury, is made liable, under the act.

The broad question is presented, whether the act transcends the limits of legislative power, in subjecting a landlord to liability, under the circumstances mentioned in the act. Does the act, in effect, deprive him of his property without "due process of law," in the sense of the Constitu-

tion. If the act can be sustained as to the landlord, it is clearly valid as to all other persons ; and its validity as to the landlord is the question directly presented in this case.

We need not enter into any elaborate discussion of the meaning of the words "due process of law." This has been done in numerous judicial decisions. They are held, under the liberal interpretation given to them, to protect the life, liberty and property of the citizens against acts of mere arbitrary persons, in any department of the government. (DENIO, J., in *Westervelt* v. *Gregg*, 12 N. Y., 212.) These are the fundamental civil rights, for the security of which society is organized, and all acts of legislation which contravene them are within the prohibition of the constitutional guaranty. In judicial proceedings, due process of law requires notice, hearing and judgment ; in legislative proceedings, conformity to the settled maxims of free governments, observance of constitutional restraints and requirements, and an omission to exercise powers appertaining to the judicial or executive departments. It is as difficult, as it would be unwise to attempt an exact definition of their scope. Their application, in a part'cular case, must be determined when the question arises, and, in the absence of exact precedents, courts must determine the .question, upon a consideration of the general scope of legislative power, the practice of governments, and in view of the conceded principle that individual rights may be curtailed and limited to secure the public welfare and the equal rights of all. " ' Due process of law,' in each particular case, means," says Judge COOLEY, " such an exertion of the powers of government as the settled maxims of the law sanction, and under safeguards for the protection of individual rights as those maxims prescribe for the class of cases to which the one in question belongs." The right to life, liberty and property is not absolute or uncontrollable. The qualification in the bill of rights implies that there may be a deprivation of those rights by due process of law, and governments could not be maintained, in the absence of the power somewhere to regulate the relations of

individuals to the State and to each other.   Life, liberty or property may be forfeited for crime.   Private property may be taken for public use, on condition of compensation, or by taxation, or it may be transferred by judicial process, for the satisfaction of private contracts or as a compensation for private wrongs and injuries.

The purpose of the act in question, as indicated by its title, is the suppression of "intemperance, pauperism and crime."   It cannot be denied that these are public purposes within the legitimate scope of legislation, nor can it be doubted by any observing and intelligent person that the use of intoxicating liquors is the fruitful source of many of the evils which afflict society.   Pauperism, vice, and crime are the usual concomitants of the unrestrained indulgence of the appetite for strong drink.   Impoverishment of families, the imposition of public burdens, insecurity of life and property are consequent upon the prevalence of the great evil of intemperance. If the Legislature was impotent to deal with the traffic in intoxicating liquors or powerless to restrain or regulate it in the interest of the community at large, because legislation on the subject might, to some extent, interfere with the use of property or the prosecution of private business, the Legislature would be shorn of one of its most usual and important functions.   But, as we have said, the right of the Legislature to regulate the traffic is shown by the uniform practice of the government.   It may not only regulate, but it may prohibit it.   This was declared after solemn argument and mature deliberation, in one of the propositions adopted by this court in *Wynehamer* v. *The People*, subject only to the qualification that the prohibition shall not interfere with vested rights of property.   The same principle was declared in the case of *Metropolitan Board of Excise* v. *Barrie* (34 N. Y., 657); and that the legislative power extends to the entire prohibition of the traffic has been recently recognized by the Supreme Court of the United States.

It is quite evident that the act of 1873 may seriously interfere with the profitable use of real property by the

Opinion of the Court, per ANDREWS, J.

owner. This is especially true with respect to a building erected to be occupied as an inn or hotel, and specially adapted to that use, where the rental value may largely depend upon the right of the tenant to sell intoxicating liquors. The owner of such a building may well hesitate to lease his property, when by so doing he subjects himself to the onerous liability imposed by the act. The act, in this way, indirectly operates to restrain the absolute freedom of the owner in the use of his property, and may justly be said to impair its value. But this is not a taking of his property, within the meaning of the Constitution. He is not deprived either of the title or the possession. The use of his property for any other lawful purpose is unrestricted, and he may let or use it as a place for the sale of liquors, subject to the liability which the act imposes. The objection we are now considering would apply with greater force to a statute prohibiting, under any circumstances, the traffic in intoxicating liquors, and as such a statute must be conceded to be within the legislative power, and would not interfere with any vested rights of the owner of real property, although absolutely preventing the particular use, *a fortiori* the act in question does not operate as an unlawful restraint upon the use of property.

That a statute impairs the value of property does not make it unconstitutional. All property is held subject to the power of the State to regulate or control its use, to secure the general safety and the public welfare. "We think it is a settled principle," says Chief Justice SHAW, in *Com.* v. *Alger* (7 Cush., 84), "growing out of the nature of well-ordered civil society, that every holder of property, however absolute and unqualified may be his title, holds it under the implied liability that his use shall not be injurious to the equal enjoyment of others having an equal right to the enjoyment of their property, nor injurious to the rights of the community. All property is held subject to those general regulations which are necessary to the common good and general welfare." Judge REDFIELD, in a passage often

cited with approval, speaking of the police power, says : " By this general police power of the State, persons and property are subjected to all kinds of restraints and burdens, in order to secure the general comfort, health and prosperity of the State; of the perfect right of the Legislature to do which no question ever was, or upon acknowledged general principles can be made." (*Thorpe* v. *R. and B. R. R. Co.*, 27 Vt., 140.) The police power so called inheres in every sovereignty, and is essential to the maintenance of public order and the preservation of mutual rights from the disturbing conflicts which would arise, in the absence of any controlling, regulating authority, and has been constantly exercised by the Legislature in a great variety of cases. We need not enumerate the subjects in relation to which this power has been exercised. We shall content ourselves by referring to two cases, recently decided by the Supreme Court of the United States, to show how far courts have gone in upholding legislation affecting private rights and property, as a due exercise of the police power residing in the State. Those cases are *The Slaughter House Cases* (16 Wall., 36), and *Munn* v. *The State of Illinois* (4 Otto, 114). The first case involved the question of the validity of a statute of Louisiana, passed in 1869, granting to a corporation, created by the act, the exclusive right for twenty-five years to have and maintain slaughter houses, landings for cattle, and yards for inclosing cattle intended for sale or slaughter, within the parishes of Orleans, Jefferson and St. Bernard, a territory containing over a thousand square miles, including the city of New Orleans, and a population of several hundred thousand persons, and prohibiting all other persons from building, keeping or having slaughter houses, landings or yards for cattle intended for sale or slaughter, within these limits, and requiring that all cattle and other animals, intended for sale or slaughter within that district, should be brought to the yards and slaughter houses of the corporation, and authorizing the corporation to exact certain fees for the use of its wharves and for each animal

slaughtered. It appeared that when the act was passed there were within this territory a thousand or more persons, engaged in the preparation and sale of animal food, many of whom owned slaughter houses and yards used in the prosecution of their business. The act was entitled "an act to protect the public health," etc., and the court held it valid, as a police regulation. That the act seriously interfered with the prosecution of a lawful business by a large number of people and greatly impaired the value of slaughter house property is evident. But the majority of the court were of opinion that the act was not void, either as creating a monoply or as depriving the persons affected by it of their property, within the meaning of the Constitution. In *Munn* v. *The State of Illinois*, the court sustained an act of the Legislature of Illinois, prescribing a maximum rate of charges for the handling of grain, in warehouses in that State, and requiring warehousemen to procure a license, and authorizing its revocation, and prohibiting the carrying on the business of warehousing grain, in any warehouse, without such license, or after its revocation. The act was held to be valid, as well as to warehouses built before as to those which might be built after the act was passed. The right of the State to make the regulations contained in the acts was put upon the ground that the subject was one involving the public interest and the general welfare. WAITE, Ch. J., in delivering the opinion of the court, said : " When one devotes his property to a use in which the public have an interest, he, in effect, grants to the public an interest in that use, and must submit to be controlled by the public for the common good, to the extent of the interest he has thus created." These cases may perhaps be deemed to have carried the right of legislative interference with private rights and property to its utmost limit, but they illustrate the scope of the police power in legislation ; and the reports abound in decisions which show that the State has authority to regulate the use and enjoyment of property and the control of private business, in many ways, "without coming in con-

flict with any of those constitutional principles which are established for the protection of private rights or private property."

The right of the Legislature to control the use and traffic in intoxicating liquors being established, its authority to impose liabilities upon those who exercise the traffic, or who sell or give away intoxicating drinks, for consequential injuries to third persons, follows as a necessary incident. And the act of 1873 is not invalid because it creates a right of action and imposes a liability not known to the common law. There is no such limit to legislative power. The Legislature may alter or repeal the common law. It may create new offenses, enlarge the scope of civil remedies, and fasten responsibility for injuries upon persons against whom the common law gives no remedy. We do not mean that the Legislature may impose upon one man liability for an injury suffered by another, with which he had no connection. But it may change the rule of the common law, which looks only to the proximate cause of the mischief, in attaching legal responsibility, and allow a recovery to be had against those whose acts contributed, although remotely, to produce it. This is what the Legislature has done in the act of 1873. That there is or may be a relation, in the nature of cause and effect, between the act of selling or giving away intoxicating liquors, and the injuries for which a remedy is given, is apparent, and upon this relation the Legislature has proceeded in enacting the law in question. It is an extension, by the Legislature, of the principle expressed in the maxim, " *Sic utere tuo ut alienum non lædas*," to cases to which it had not before been applied, and the propriety of such an application is a legislative and not a judicial question.

It is said that the statute imposes a liability for the consequences of a lawful act. But the Legislature, having control of the subject of the traffic in and use of intoxicating liquors, may make such regulations to prevent the public evils and private injuries resulting from intoxication as in its judgment are calculated to accomplish this end. It may

prohibit the selling or giving away of liquors, or it may, while not interfering with the liberty of sale or use, guard against the dangers of an indiscriminate traffic, and induce caution, on the part of those who engage in the business, by subjecting them to liabilities for consequential injuries.

The act of 1873 does not deprive the seller, who is made liable under the act, of his property, without due process of law. It authorizes it to be appropriated, in the due course of judicial proceedings, for the satisfaction of injuries resulting from intoxication caused by his act. The Legislature has said that the seller may be treated as the author of the injuries, and we think this was within the legislative power.

The liability imposed upon the landlord for the acts of the tenant is not a new principle in legislation. His liability only arises when he has consented that the premises may be used as a place for the sale of liquors. He selects the tenant, and he may, without violating any constitutional provision, be made responsible for the tenant's acts connected, with the use of the leased property. In *Dobbins* v. *The United States*, recently decided by the United States Supreme Court, a distillery, with the real and personal property used in connection therewith, had been seized and condemned to be forfeited, for the violation, by a lessee, of certain provisions of the act of Congress, regulating the business of distilling. No fraud was imputed to the owner of the premises, and he was not charged with any complicity with the tenant, in violating the law. The owner objected that his property could not be forfeited for the acts of the tenant, committed without his knowledge or consent. But the court affirmed the decree of condemnation; and, in his opinion, CLIFFORD, J., says: " The legal conclusion must be that the unlawful acts of the distiller bind the owner of the property, in respect to the management of the same, as much as if they were committed by the owner himself. Power to that effect the law vests in him by virtue of his lease ; and, if he abuses his trust, it is a matter to be settled between him and his lessor; but the

acts of violation as to the penal consequences to the property are to be considered just the same as if they were the acts of the owner."

Our conclusion is that the act of 1873 is a constitutional enactment. It is doubtless an extreme exercise of legislative power, but we cannot say that it violates any express or implied prohibition of the Constitution.

There are some subordinate questions presented, as grounds for the reversal of the judgment. They were considered by the General Term, and we concur in its conclusions in respect to them.

The judgment must be affirmed, with costs.

All concur.

Judgment affirmed.